**LABORERS' DISTRICT COUNCIL OF GEORGIA AND SOUTH CAROLINA, affiliated with Laborers' International Union of North America, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Southern Frozen Foods, Inc., Intervenor.

No. 73–1341.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1974.

Decided July 19, 1974.

Jules Bernstein, Washington, D. C., with whom Robert J. Connerton and Arthur M. Schiller, Washington, D. C., were on the brief, for petitioner.

Vivian A. Miller, Atty., N.L.R.B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate

Gen. Counsel, Elliot Moore, Asst. Gen. Counsel, and Robert A. Giannasi, Atty., N.L.R.B., were on the brief, for respondent.

Walter O. Lambeth, Jr., Atlanta, Ga., for intervenor. Warner S. Currie, Atlanta, Ga., also entered an appearance for intervenor.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This is an action under § 10(f) of the National Labor Relations Act[1] (hereafter "the Act") to review a Decision and Order of the National Labor Relations Board ("the Board"). The Board's Order of March 28, 1973[2] held that the conduct of Intervenor Southern Frozen Foods, Inc. ("the Company") during an organization campaign conducted by Petitioner Laborers' District Council of Georgia and South Carolina, Affiliated With Laborers' International Union of North America, AFL–CIO ("the Union") did not violate § 8(a)(1) of the Act.[3] For the reasons stated below we affirm the decision of the Board and deny the Petition to Review.

The Company operates two frozen food vegetable processing plants in Montezuma, Georgia, which average 650 employees. In October, 1971, the Union filed a petition with the Board seeking to represent the Company's production and maintenance employees. An election, held in December, 1971, resulted in 310 votes for the Union, 20 votes for an intervening union, and 304 votes for "no union." No one choice on the ballot having received a majority, the Board directed that a runoff election be conducted.

Prior to the runoff election the Union filed an unfair labor practice charge with the Board, alleging that the Company had violated § 8(a)(1). In the runoff election, held January 22, 1973, the Union again failed to gain a majority of votes cast.[4] The Union filed objections to the election, however, the representation case was severed and remanded to the Board's Regional Director before the instant unfair labor practice case was sent to the Board for decision[5] and there are no representation issues before us for review.[6]

A hearing was held May 3–4, 1972, and the Administrative Law Judge found, *inter alia*, that the Company had violated § 8(a)(1) by distributing certain campaign literature to its employees between November 3, 1971 and January 27, 1972. The A.L.J. also found that a certain speech from the management supervisor to several employees violated the Act. Lastly, he found that one employee was threatened with discharge because of her union activities.[7]

The Board on review, found: 1) that with one exception[8] the Company's literature was a permissable exercise of free

1. 29 U.S.C. § 160(f) (1970).

2. Board Case No. 10–CA–9374, reported at 202 NLRB No. 92 (1973), 82 LRRM 1642 (1973).

3. "Sec. 8. (a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . .."

4. 213 votes pro-union; 344 votes "no union". Br. of Petitioner at 3.

5. 202 NLRB No. 92 at 1 n. 1.

6. Although the briefs were silent on the reason for the severance, it is clear that there is no judicial review of the Board's § 9 certification decisions, unless they are "incidental to review of an order restraining an unfair labor practice under § 10." A. F. of L. v. NLRB, 308 U.S. 401, 410, 60 S.Ct. 300, 304, 84 L.Ed. 347 (1940). The Board has been entrusted with complete control of election proceedings. Excelsior Laundry v. NLRB, 409 F.2d 70 (10th Cir. 1968).

The Board conducted a second runoff election August 29, 1973, and counsel informed this court during oral argument that again the Union failed to receive a majority, gaining but 123 votes out of 379 cast.

7. The decision of the Administrative Law Judge is found at Joint Appendix, Volume I at 3–38. (Hereafter J.A. I.)

8. The Board found that a letter from the Company President to all employees, dated January 5, 1972 (*see* note 10 *infra*), contained a threat that the Company would be

speech and not violative of the Act; 2) that the supervisor's remarks did not violate the Act; and 3) that the employee was not unlawfully threatened.[9]

The Union now petitions for review asserting that the Board committed error in finding that the Company had not violated § 8(a)(1) of the Act in the various ways enumerated above. We will treat each alleged violation separately.

## A. *Campaign Literature*

The organization campaign was characterized by the Board as "a heated campaign typified by sharp conflicts of interests." 202 NLRB No. 92 at 9. Both sides actively campaigned, distributing much printed material in the form of leaflets, letters, posters, and crudely drawn pictorial appeals which for want of a better name may be called "cartoons." Of all the material circulated by the Company, four items are of particular importance: a letter from the Company president to all employees dated January 5, 1972;[10] a similar letter dated January 14, 1972;[11] a third letter dated

---

less responsive to the employees should they choose the Union. 202 NLRB No. 92 at 8, 10; J.A. II. at 11. The Board concluded that this letter violated the Act and ordered the Company to cease and desist therefrom and to place an appropriate notice to all employees. 202 NLRB No. 92 at 10-11. The Company has voluntarily complied with this order and therefore the Board has not petitioned for enforcement.

9. 202 NLRB No. 92 at 3, 5, 9-10.

10.                                    January 5, 1972
Dear Fellow Employee:
We have been advised that our next union election is scheduled for January 27, 1972. The polling places will be the same as before.
The time has come for us to talk turkey. We know we need to make some changes, and we will once we get this union mess out of the way. The plain facts are the union can not do anything for you to make this a better place to work or get you more money.
Put yourself in our position: If you have a friend who is appreciative of what you try to do for him and another who makes demands—which one of them are you going to help the most? The answer is obvious—we are human the same as you are. If we are going to continue to grow and maintain our operation providing jobs in Montezuma, we must have your help. You probably have not looked at the company's side of the situation—but you should. Believe me, what is good for the company is good for you. Having a union would not be good for the company—so it can not be good for you.
The best thing you can do—if your future is here in Montezuma and you plan on making a career working for Southern Frozen Foods—is to vote this union out of here once and for all. When that is done all of us can get back to the business at hand—trying to make a profit which is

where whatever benefits you and I enjoy come from.
If you have any question about what has been said above or anything else pertaining to this company or your situation, ask me, your supervisor, or your department head.
                              Sincerely,
                              /s/ Preston
                              Preston Williams
                              President
J.A. II. at 11.
The Board held that this letter constituted a violation of § 8(a)(1). *See* note 8 *supra.*

11.                                  January 14, 1972
Dear Fellow Employee:
Some of you have asked why the Company people don't visit you at your homes as the Union has been doing. The rules keep us from visiting your home. We can only write you or talk to you at the plant.

You do not now pay union dues. You are now receiving yearly wage reviews and including your fringe benefits. The Union wants you to pay $6.50 a month in dues. What will they guarantee you for your money?

If they give you a promise or guarantee, how can they carry it out? Your Company doesn't *have* to agree to anything the Union proposes. We won't agree to anything we feel is bad for you or the Company. The only thing the Union can do about it is try to force us by a strike. If you strike we have the right to replace you. Strikes only happen in Union plants. The Union would have to get you an extra $6.50 a month for you to even break even. Your Company has given all the raise Phase 2 of the wage freeze allows. No one knows when the freeze will end. We appreciate your help in making the Company what it *is*. We feel *that* we *would* never do more for Mr. Bartlett than we would do for you voluntarily.

January 24, 1972;[12] and a cartoon distributed January 21, 1972.[13] The Administrative Law Judge found specifically that these individual items

. . . were not predictions "carefully phrased on the basis of objective fact to convey an employer's belief as

Several people have asked why we are against the Union. We are against the Union because we know they can wreck the Company and reduce the number of jobs. We have all seen what has happened at Seabrook. We don't want that here. We don't know of a single plant where more jobs have been created by a union. We don't know a single customer that the Union can get us. We do know of some customers we would lose if the Union caused us to up our prices.

Mr. Bartlett doesn't care about layoffs. Union dues are only paid by the people working. Mr. Bartlett can't create any jobs.

His union has lost so many elections in Georgia this year they are desperate for new members. Don't be misled by false promises. We are going to continue to manage this business—Protect Your Future—Vote "NO."

Sincerely,
/s/ Preston Williams
Preston Williams
President

J.A. II. at 12.

12. January 24, 1972

Dear Fellow Employee:

Because of our short work schedule at this time it is going to be impossible for me to see some of you before the election on Thursday, January 27, at 3:00 P.M. Let me encourage you to make every effort to come and to vote—do not leave this decision to someone else to make for you.

We have been told that the Laborer's have people going house to house. We cannot do this—if we could—we would be sending you people you could trust with facts, not wild promises. What I have told you in the past—I have done and nobody is going to change my attitude about the importance of keeping my word.

We are bound together by such ties that whatever happens to any one of us should affect every other one of us. Any good fortunes and successes the Company has should cause you to experience a new sense of joy since you will share in that success through our being in position to do more for you. At the same time our disappointments and failures can only bring regret to the Company and to you. Each of us has a responsibility to be concerned—I am—and I hope you are.

to demonstrably probable consequences beyond his control." Rather they directly conveyed that Respondent would "take action solely on [its] own initiative for reasons unrelated to economic necessities and known only to [it]" to resist demands for changes that Re-

We all have our faults and certainly we have all experienced many failures. No one is kidding me and I don't want someone else to try to kid you into believing that what the union is offering is better than my intents—which have been proven. We need each other—the way our system is today my help is always available—don't let an outsider change all of that.

Those of you who are wise, and I honestly feel most of you are, will gratefully accept the concerned efforts of those who really care about you. This is a day when we cannot make it alone. We should be grateful for the unselfish concern of those around us who are not looking to profit at our expense but help solely because they care and are concerned.

Concern, however, is not enough unless we intend to give ourselves in a real and positive program seeking solution to these problems. I am that concerned and if given the opportunity through your vote on January 27—I will continue to try to prove to you that all that has been said by me is true.

Sincerely,
/s/ Preston Williams
Preston Williams
President

J.A. II. at 15.

13. This cartoon depicts three characters: "Preston," the Company president; "You," the employee; and "Big Daddy" Bartlett, the Union organizer. The dialogue reads as follows:

Once there were two people who worked together to build a successful business They were pretty happy until a stranger (*who didn't work to build anything*) said to one . . .

"You poor exploited so and so! You're not getting enough from the business!"

"Just sign this card and I'll help you make him give you more."

"*Then lets you fight him*," he said happily . . .

"If it doesn't work out *I* haven't lost anything."

*YOU stand to loose, not "BIG DADDY"*

There is a picture of a building, presumably representing the plant with a sign on it reading "Closed".

J.A. II. at 1.

spondent might make in the absence of a union and leave the Union with a strike as its only alternative carrying with it the probable result of loss of jobs or a plant shutdown. The conclusion follows that Respondent intended "to threaten to throw employees out of work regardless of the economic realities," if the Union won the election. I find that Respondent's written communications to its employees during the pre-election period violated Section 8(a)(1) of the Act as alleged in the complaint.

J.A. I. at 28 (citations omitted). As to the bulk of other items distributed by the Company, the Administrative Law Judge found that "the express content of [the above enumerated letters] was not repeated in [the Company's] other literature, but the campaign literature otherwise served only to reinforce them." *Id.* at 27.

The Board, in its review of the whole campaign, focused on the aforementioned four communications upon which the A.L.J. had relied to find specific unlawful Company threats of reprisal. The Board stated:

In our view, a reading of the entire record does not support the Administrative Law Judge's conclusion that the above-mentioned pieces of literature distributed on January 14, 21, and 24, along with others, constituted a threat that Respondent would throw its employees out of work regardless of the economic realities if the Union won the election. Respondent's communications at most represent one side of a heated campaign typified by sharp conflicts of interests. We note that from time to time the Union replied in an equally vigorous, partisan, and aggressive manner. Accordingly, we find on the basis of the totality of the campaign that with the exception

of the January 5, 1972 letter Respondent's literature did not contain unlawful threats of retaliation if the Union were selected to represent the employees but rather were recitals of Respondent's beliefs regarding demonstrable economic consequences which could possibly flow from unionization. As such, the statements are protected by Section 8(c) of the Act. Accordingly, we shall dismiss the complaint except as it relates to the January 5 letter.

202 NLRB No. 92 at 9–10. Section 8(c), the provision relied upon by the Board reads as follows:

(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

■ The Union here argues simply that the A.L.J.'s findings were correct and that the "Board erred grievously in reversing [the A.L.J.'s] conclusions . . . .".[14] The Union states that in its communications, the Company "repeatedly stressed the likelihood of the plant closing in the event of unionization, although it did absolutely nothing to demonstrate any objective basis for this prediction."[15] The Union does not, however, direct us to *any specific* language from company letters, leaflets, or cartoons by which to illustrate threats or coercion on the part of the Company. We therefore take it that the Union here reasserts the views of the A.L.J. as to which specific company communications were unlawful, and shall review the findings of the Board as to those specific items.[16]

14. Br. of Petitioner at 20.

15. *Id.* at 21.

16. We note in this regard that the Board here merely disagreed with the A.L.J. as to the inferences and legal conclusions to be

drawn from the facts found. In such cases, where a disagreement between the Board and the A.L.J. does not turn on questions of fact or on credibility of witnesses, no special weight need be given to the conclusions of the A.L.J. *See, e. g.*, Sign and Pictorial Un-

■ It is well established that an employer has a right to express his opinions and to predict unfavorable conse-quences which he believes may result from union representation. Such predictions or opinions will not violate the Act if they have some reasonable basis in fact and are in fact predictions or opinions and not veiled threats of employer retaliation. In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) the Court enumerated the standards to be used in evaluating an employer's pre-election statements.

> But we do note that an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board. Thus, § 8(c) (29 U.S.C. § 158(c)) merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8(a)(1).

> · · · · · ·

> Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. . . . If there is any implication that an employer may

> or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. . . . [A]n employer is free only to tell "what he reasonably believes will be the likely economic consequences of unionization that are outside his control," and not "threats of economic reprisal to be taken solely on his own volition."

395 U.S. at 617–619, 89 S.Ct. at 1941 (citations omitted). See also Amalgamated Clothing Workers of America v. NLRB, 137 U.S.App.D.C. 330, 424 F.2d 818 (1970); NLRB v. Lenkurt Electric Company, 438 F.2d 1102 (9th Cir. 1971); Automation & Measurement Division, Bendix Corp. v. NLRB, 400 F.2d 141, 144–145 (6th Cir. 1968); Truck Drivers and Helpers Local No. 728 v. NLRB, 124 U.S.App.D.C. 289, 364 F.2d 682 (1966).

■ Turning first to the letter of January 24, 1972,[17] there is substantial evidence to support the Board's finding that it carries no threats or coercive language. It begins by encouraging all employees to vote. It mentions the honor and honesty of the author, "the importance of keeping his word" to his employees. The letter makes an appeal to loyalty, stressing that the employees and the Company will share equally in both the good and the bad which may come in the future. It continues to the effect that the Company has helped its employees in the past and will, pledges the author, continue to do its very best for them in the future. The only slightly aggressive language is the request "don't let an outsider change all of that." We must ascertain whether this let-

ion Local 1175, etc. v. NLRB, 136 U.S.App. D.C. 144, 419 F.2d 726, 733–734 (1969); Oil, Chemical and Atomic Workers Int. U., Local 4–243 v. NLRB, 124 U.S.App.D.C. 113,

362 F.2d 943, 945–946 (1966); NLRB v. Lenkurt Electric Company, 438 F.2d 1102, 1105 n. 3 (9th Cir. 1971).

17. See note 12 supra.

ter has an apparent tendency to coerce[18] when viewed in the context of a labor relations setting.[19] In our view, there is substantial evidence to support the finding of the Board[20] that the letter indicates the Company intended to continue its past policy of caring about its employees and that by so doing, it would try to give employees more than would the Union. The Board reasonably concluded that the letter contains no express or implied threats of retaliation.

The letter of January 14, 1972,[21] states that the Union would require dues; that the Company did not have to agree to any Union proposal; that the Union may have to strike; that strikers could be replaced; that the Company had already granted all wage increases permitted under the wage price guidelines then in effect. The letter then stated that other Union plants had experienced strikes and that "we know of some customers we would lose if the Union caused us to up our prices." Finally the letter referred to "what has happened at Seabrook,"[22] a reference to a reduction in work force at another Seabrook-owned plant in New Jersey following the imposition of union work restrictions concerning the simultaneous handling of fresh and frozen foods. These Union rules resulted in a work reduction in New Jersey and a transfer of work to Southern's Georgia plant.

■ We believe that the Board was correct when it found that the letter of January 14, 1972 was not a threat that the Company would remove employees from the job regardless of economic realities should the Union prevail. The letter contained statements which the Board could find not coercive and which the employer had a right to state.[23] The reference to the possibility of a strike was a reference to possible *union* action, not Company action, and thus is protected by 8(c) since it had a reasonable basis in fact.[24] The reference to "some customers" who would be lost if prices were increased was not a prediction of business disaster as it did not identify those customers as significant to the Company.[25] Indeed the Company had consistently predicted full production.[26] The letter's reference to the "Seabrook" incident was a factually accurate statement. In sum, we believe the record amply supports the finding that these employer statements were based on objective facts and conveyed the Company's reasonable belief as to possible economic consequences of unionization beyond the Company's control. See *Gissel, supra,* 395 U.S. at 618, 89 S.Ct. 1918; NLRB v. Lenkurt Electric Company, 438 F.2d 1102 (9th Cir. 1971); NLRB v. River Togs, Inc., 382 F.2d 198 (2d Cir. 1967).

■ Turning finally to the cartoon of January 21, 1972,[27] we believe that there exists substantial evidence to support the Board's finding that the "closed" sign on the plant depicted in one of the

18. *See, e. g.,* Mon River Towing, Inc. v. NLRB, 421 F.2d 1, 9 n. 24 (3rd Cir. 1969); NLRB v. Standard Container Co., 428 F.2d 793, 794 (5th Cir. 1970).

19. NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

20. 202 NLRB No. 92 at 9.

21. *See* note 11 *supra.*

22. Southern Frozen Foods, Inc. ("the Company") is a subsidiary of Seabrook Foods, which operates food processing plants in several states.

23. *See, e. g.,* Russell-Newman Mfg. Co. v. NLRB, 370 F.2d 980, 982–983, 985 (5th Cir. 1966); *cf.* NLRB v. Sonora Sundry Sales, Inc., 399 F.2d 930 (9th Cir. 1968).

24. *See, e. g.,* NLRB v. S. & H. Grossinger's Inc., 372 F.2d 26, 28 (2d Cir. 1967); Don the Beachcomber v. NLRB, 390 F.2d 344, 345 (9th Cir. 1968); NLRB v. Transport Clearings, Inc., 311 F.2d 519, 523–524 (5th Cir. 1962); NLRB v. Lyman Printing Co., 356 F.2d 844, 846 (4th Cir. 1966).

25. This distinguishes Blaser Tool & Mold Co., Inc., 196 NLRB 374 (1972). In that case the employer stated that one customer who purchased 98% of the total company output would stop dealing with the company should the union prevail.

26. *See* Letter of December 20, 1971 from Company President to all employees, J.A. II. at 9.

27. *See* note 13 *supra.*

six drawings does not constitute a serious threat that the Company would close *in retaliation for a union vote*. This is especially true since the Company specifically stated its desire to "use [the plant] to the fullest" regardless of the election's outcome.[28] At the most, the "closed" sign could be read as the result of the "fight" (*i. e.* strike) which unionization might precipitate; it does not represent a threat to close the plant.

### B. *Speech by Mr. Kato Harvey*

■ Mr. Kato Harvey was assistant manager of the Company's poly-repack[29] department. Several times during the several pre-election periods he spoke to the workers in his department. Both the complaint and evidence received focus upon the last of Mr. Harvey's speeches, the exact date of which is unknown.[30] The testimony concerning the contents of the speech was confused and conflicting,[31] and the A.L.J. chose to credit Mr. Harvey's recollection of the speech while discrediting the testimony of other witnesses.[32]

The A.L.J. found and the Board accepted the following: Mr. Harvey told the employees that he worked as a supervisor and therefore that he "had to be for the Company."[33] He expressed his wish that they would feel the same. He stated his belief that Company employees generally did "all right" and thay they would continue to do so without a union.[34] He also spoke about the possibility of the loss of the poly-repack turnip packaging operation. Previously, this packaging had been done at the parent company's New Jersey plant but a union contract concerning the handling of mixed fresh and frozen produce caused the work to moved to this Company's plant. Mr. Harvey testified concerning his remarks as follows:

Q. All right. So was there anything else?

A. Anything else I told them?

Q. Right. At that time.

A. Well I told them about the—together were putting up about seventy-eight million pounds of turnips with roots and so that that handline was doing about seventy-five percent of them. And also I thought if they cut that out, that was sort of hurt their jobs.

Q. What do you mean "if they cut that out," Mr. Harvey?

A. If they cutting out putting up turnips with roots in the poly repack, they wouldn't have much to do, wouldn't stay in business.

Q. Had anything happened that made you think they might cut out the roots?

A. Well I was told that they were putting up turnips with roots up at Seabrook Farms and also—and also if the Union come in, they may cut that out at Southern Frozen Foods.

J.A. I. at 104–05.

A. So I told the people that worked in my department they had enough turnip roots for three weeks, I mean they behind. And if they cut that out, they was cutting their job and so that mean that why they not putting the turnip roots at Seabrook the time the Union come in. And I figure if the Union come in here,

---

28. *See* note 26 *supra*.

29. Poly-repack is the process by which a mixture of previously frozen turnip roots and fresh unfrozen turnip greens are packaged for final sale. J.A. I. at 10.

30. The A.L.J. accepted Mr. Harvey's testimony that he did not remember exactly when he spoke and found it "unnecessary to pinpoint the exact date . . . for it was clear that it was either in late December or early January and between the [first] two elections." J.A. I. at 9.

31. J.A. I. at 9, 55–56, 58–62, 68, 70–72.

32. J.A. I. at 9. It is well settled that the credibility resolutions of the A.L.J., especially when accepted by the Board, must normally be accorded great weight on review. *See, e. g.*, NLRB v. Walton Mfg. Co., 369 U.S. 404, 407–408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

33. J.A. I. at 9; 202 NLRB No. 92 at 6.

34. J.A. I. at 10; 202 NLRB No. 92 at 6.

that'll come out with your work. That's what I meant.

Trial Examiner: That's what you said to the people?

The Witness: That's right. That's what I said.

Q. (By Mr. Currie) Did you give any explanation of how or why the union cut out the turnip roots at Seabrook?

A. Well they said they didn't allow them to mix together like we was doing down here.

Q. Didn't allow them to mix them together.

A. Yes, sir, like we was doing.

J.A. I. at 109.

Q. (By Trial Examiner) Well did you say anything about why the turnips would be cut off or when the turnips would be cut off?

A. I didn't say they was gonna be cut off, I say if they be cut off. I didn't say that they was, I say they had been cut off in Seabrook. We was putting up Seabrook's turnips for them.

J.A. I. at 123.

The record further revealed, and the Board found, that on January 10, 1972, the Company mailed a letter to all employees which contained a reference to the job reductions at Seabrook, New Jersey. It read in pertinent part:

At the New Jersey plant the company is restricted from running frozen and fresh vegetables together. They don't run turnips and greens as we do. If we were restricted like this, we would not run the 7,500,000 pounds of turnips and greens we ran in 1971. Think how many hours of work and jobs would be lost. Also, if the union by unreasonable demands caused us to stop running any particular products, we would have to permanently lay off

people. What would this do to you? We know the men could probably travel to other towns for jobs, but what jobs could the women get?

J.A. II. at 38.

On the basis of this evidence, the A.L.J. concluded that Mr. Harvey's remarks "conveyed a threat of reprisal and violated Section [8](a)(1) of the Act." [35] The Judge stated his reasons for this finding to be that Mr. Harvey's remarks were "not a reasoned and factual statement of what had happened in New Jersey" [36] and that the remarks implied that if the Union were to prevail, the poly-repack operation might be lost "for reasons unrelated to the economic necessities or any contract the Union might negotiate." [37] The A.L.J. did not accept the proposition that the January 10 letter dispelled or nullified any possible threat contained in Mr. Harvey's speech because the letter did not mention Mr. Harvey's remarks and did not fully explain the work restrictions.[38]

The Board found that:

In our view, Harvey's remarks are ambiguous and do not clearly imply a threat that a union victory would automatically be followed by a loss of employment. Harvey's statements especially when taken together with Respondent's January 10, 1972, letter, do nothing more than raise the possibility that if the Union came in it could conceivably restrict Respondent the way it had restricted the parent company in New Jersey, with the result that the turnips would be packed elsewhere. Considering the totality of statements concerning the turnip operation, we are not prepared to say that Respondent's communications threatened employees with loss of employment. Accordingly, we find such remarks permissible and not violative of the Act.

202 NLRB No. 92 at 7.[39]

---

35. J.A. I. at 13 (footnote omitted).

36. J.A. I. at 12.

37. *Id.*

38. J.A. I. at 13.

39. We note that the Board apparently misconstrued the facts of the New Jersey inci-

We believe that the decision of the Board was a permissible one, supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In so holding, we again recognize that the Board's findings must be accorded great weight because they carry the "authority of an expertness." Id. at 488, 71 S.Ct. 456. We recognize that it is the Board's duty "in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." Gissel, supra, 395 U.S. at 620, 89 S.Ct. at 1943.[40] We believe the Board could correctly find that Mr. Harvey's remarks when considered with the Company's January 10th letter did no more than suggest the possibility that a Union victory could result in work restrictions leading to the loss of employment. This is what occurred in the New Jersey plant after unionization.[41] Therefore we find that these predictions were "carefully phrased on the basis of objective fact to convey [a Company] belief as to demonstrably probable consequences beyond [its] control . . ." and are thus lawful under Gissel, supra, 395 U.S. at 618, 89 S.Ct. 1942. The Company is permitted to inform its employees of the possible adverse economic consequences of their vote which might arise from demonstrable Union demands or policies. See, e. g., NLRB v. Lenkurt Electric Co., 438 F.2d 102, 105–108 (9th Cir. 1971); NLRB v. River Togs, Inc., 382 F.2d 198, 201–202 (2d Cir. 1967).

## C. Mr. Studdard's Remarks to Ms. Butler

Ms. Mollie Butler was an employee in the poly-repack department. About a week prior to the first election, Ms. Butler was summoned to the office of the department supervisor, Mr. Kato Harvey. There, with Mr. Harvey present, Mr. Studdard, Company Personnel Director, informed Ms. Butler that there had been complaints [42] about her "running her mouth on the line about the Union." [43] Mr. Studdard told Ms. Butler that he did not care how she felt about the Union, that she could talk about it on her break time or her lunch time, but not on the line during working periods. Mr. Studdard informed her that if her behavior occasioned similar complaints in the future, she would be dismissed.[44]

The A.L.J., after making these findings of fact, found that Ms. Butler "was warned only against talking about the

---

dent as it referred to "the possibility that if *the Union* came in it could conceivably restrict [the Company] the way *it had* restricted the parent company in New Jersey . . . ." 202 NLRB No. 92 at 7 (emphasis added). The facts seem to us to indicate that the Laborers' International Union involved here was not involved in New Jersey, but rather another union. *See* Letter of January 10, 1972, J.A. II. at 38. The Union here makes much of the Board's seeming confusion. *See* Br. of Petitioner at 27–28. Since we find that Mr. Harvey's remarks were ambiguous and accept the Board's characterization of them as non-threatening, we are of the belief that this error in the Board's opinion is not seriously prejudicial. It is, after all, the speech of Mr. Harvey which did or did not violate the Act.

40. *Accord*, Mon River Towing, Inc. v. NLRB, 421 F.2d 1, 9 (3d Cir. 1969). *See also* NLRB v. General Industries Electronics Co., 401 F.2d 297, 300 (8th Cir. 1968); Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568, 571 (4th Cir.), on rehearing en banc, 386 F.2d 306 (1967), cert. denied, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968); Amalgamated Clothing Workers of America v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 910 (1966).

41. *See, e. g.*, Russell-Newman Mfg. Co. v. NLRB, 370 F.2d 980 (5th Cir. 1966); *cf.* P. R. Mallory & Co. v. NLRB, 389 F.2d 704, 707 (7th Cir. 1967).

42. Ms. Freddie Trice, Ms. Butler's supervisor, had complained to Studdard that another employee had complained of Ms. Butler's pro-union talk during work hours and asked that it be stopped. J.A. I. at 7.

43. J.A. I. at 6. We note that the A.L.J. specifically rejected Ms. Butler's version of the incident. J.A. I. at 7, crediting the testimony of Mr. Studdard which was corroborated by Mr. Harvey. J.A. I. at 6 n. 4.

44. J.A. I. at 6.

Union during working time and threatened with discharge should she again do that." [45] In so doing, he rejected Ms. Butler's contention that the warning was against any pro-union conversation anywhere within the plant at any time. The A.L.J. found a violation of § 8(a)(1) of the Act because Ms. Butler was threatened with discharge not for the purpose of prohibiting her talking in general during working time, but to stop her from talking about the Union in particular. [46]

The Board disagreed with the legal consequences of the facts as found by the A.L.J. The Board stated in this regard:

> The evidence shows, and the Administrative Law Judge found, that Studdard's warning to Butler followed a conversation Studdard had with Trice on the previous day wherein Trice informed him that Butler's talking about the Union while working was disturbing another employee who had complained and did not want to hear about the Union. While there is no evidence that any other employees who were regularly told to stop talking were threatened with discharge for failure to comply, there is no evidence that their talking had interfered with the work of others. Since Butler's talking prompted a complaint from a fellow worker, Respondent could for legitimate business reasons have re-

quired that she stop talking during worktime. Studdard's warning referred only to worktime and made it clear that at other times Butler was free to talk about the Union. As there is no evidence that would otherwise indicate discriminatory enforcement of Respondent's prohibition against talking while at work, we shall dismiss this allegation of the complaint.

202 NLRB No. 92 at 3.

■ We think that the Board's findings are reasonable and supported by substantial evidence. Ms. Butler was clearly assured that she could speak out for the Union at all times and in all places other than the production line. We agree with the Board that an employer can make and enforce "reasonable rules covering the conduct of employees on company time. Working time is for work." [47] The Company has such a rule against talking on the job [48] and absent proof of discriminatory anti-union application, it is a lawful rule. [49] The Company had a legitimate interest in stopping Ms. Butler's pro-union comments on the line when other employees had made complaints.

■ For the reasons stated above we find that the Petition to Review was properly denied. [50] The order here under review is therefore

Affirmed.

---

45. *Id.* at 7.

46. *Id.* at 8.

47. Peyton Packing Co., 49 NLRB 828, 843 (1943), enforced 142 F.2d 1009 (5th Cir.), cert. denied, 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 585 (1944).

48. J.A. I. at 7, 97–98; 202 NLRB No. 92 at 3.

49. *See* Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *see also* TRW, Inc. v. NLRB, 393 F.2d 771, 772 (6th Cir. 1968).

50. Since we here affirm the Board's finding that only one unfair labor practice was committed by the Company, *see* note 8 *supra;* we reject the Union's contention that a bar-

gaining order should issue. *See, e. g.,* NLRB v. Gissel Packing, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We are of the opinion that the existence of but one violation of § 8(a)(1) is not the exceptional case where employer unfair labor practices were outrageous or pervasive. There is a broad presumption in favor of the remedy chosen by the Board. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 845 (1941); NLRB v. Rutter Rex Mfg. Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); International Union, United Auto, A. & A. I. Workers v. NLRB, 147 U.S.App.D.C. 289, 455 F.2d 1357 (1971). Given the limited scope of the Company's unfair labor practice, we think the remedy granted was entirely proper.